# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 97

APRIL TERM, A.D. 2014

*August 1, 2014*

SARAH STOWE,

**Appellant**
**(Defendant),**

**v.**

S-13-0219

**THE STATE OF WYOMING,**

**Appellee**
**(Plaintiff).**

*Appeal from the District Court of Carbon County*
*The Honorable Wade E. Waldrip, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; David E. Westling, Senior Assistant Appellate Counsel. Argument by Mr. Westling.

*Representing Appellee:*

Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny L. Craig, Senior Assistant Attorney General; John A. Brodie, Assistant Attorney General. Argument by Mr. Brodie.

*Before BURKE, C.J., and HILL, KITE\*, DAVIS, and FOX, JJ.*

*\* Chief Justice at time of oral argument*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]    Sarah Stowe entered a conditional nolo contendere[1] plea to a felony charge of fourth-offense driving while under the influence of alcohol, reserving the right to appeal the district court's denial of her motion to suppress evidence.  We affirm.

## ISSUES

[¶2]    Stowe contends that the results of a urine alcohol test should have been suppressed for two reasons:

> 1.  Her urine was collected pursuant to an arrest that was unlawful because the arresting officer lacked probable cause to believe that she had been driving while intoxicated.
>
> 2.  The result of her urinalysis was invalid because it was collected from a catheter in a manner that is contrary to the methods approved by the State Department of Health.

## FACTS

[¶3]    During the early morning hours of November 24, 2011, Stowe left Laramie and drove with her seven-year-old daughter toward their home in Casper.  Approximately eighteen miles north of Medicine Bow on a dry Wyoming Highway 487, her vehicle crossed the southbound lane and ran off the west side of the road.  It travelled three hundred and eighteen feet and rolled twice before coming to a stop.

[¶4]    A passerby drove the two northward from Carbon County into Natrona County until he obtained cellular phone service that allowed him to contact law enforcement and emergency medical services.  He met two Natrona County deputy sheriffs, Corporal Cohee and Deputy Olson, as well as two ambulances, at the intersection with Wyoming Highway 220.

[¶5]    At approximately 3:40 a.m., the Highway Patrol dispatched Casper-based State Trooper Adam Bruning to investigate the accident.  The ambulances carrying Stowe and her daughter were en route to the Wyoming Medical Center in Casper by the time the trooper reached the Highway 487 intersection, where he spoke with the man who had

---

[1] A nolo contendere, or "no contest", plea has the same effect as a guilty plea in a criminal case, but it cannot be used as an admission in a later civil action based on the act for which the defendant was prosecuted.  *Black's Law Dictionary* 1209 (10th ed. 2014).  Wyoming Rule of Criminal Procedure 11(a)(2) provides that, with court approval and prosecutorial consent, a defendant may enter a conditional guilty or nolo contendere plea and reserve the right to seek appellate review of an adverse ruling on a specified pretrial motion.  If she prevails on appeal, she may withdraw her plea.

driven Stowe and her daughter there and the two deputies. The Good Samaritan briefly described the scene of the single vehicle rollover, and Corporal Cohee told Trooper Bruning about her conversation with Stowe prior to the departure of the ambulances. She observed that Stowe slurred her words and gave off the overpowering odor of an alcoholic beverage. When Stowe first explained the cause of the accident, she told Cohee that she had swerved to avoid hitting a deer. She later told the corporal she had swerved to avoid a rabbit.

[¶6] Believing that there was probable cause to arrest Stowe for driving while intoxicated, but needing to locate and examine the crash scene, Trooper Bruning asked Corporal Cohee if she could have a deputy in Casper go to the hospital and obtain a blood or urine sample. Patrol Sergeant Trey Warne of the Natrona County Sheriff's Department undertook those duties.

[¶7] Sergeant Warne went to Wyoming Medical Center, where he informed Stowe that he was there at the request of the trooper who was investigating her accident, and he read her an implied consent advice form. He advised her that she was under arrest for driving while intoxicated, and he asked whether she preferred to give a blood or a urine sample. She chose the latter.

[¶8] When the sergeant first encountered Stowe, she had been catheterized due to the possibility that she had suffered lower back and neck injuries. As explained by Tara Mackler, the registered nurse who inserted the catheter, it was used to keep Stowe from moving until treating physicians received the results of a CT scan. That is, it allowed her bladder to be drained without moving her until her care providers could determine the extent of her injuries.

[¶9] Consequently, when Nurse Mackler drew the urine samples for Sergeant Warne, she used a port that was built into the catheter. To ensure that she was drawing fresh urine for each of the two required samples, she clamped a hemostat onto the catheter between the port and the collection bag, sterilized the port, and screwed a syringe body into it. After drawing a sample, she transferred it to a sterile test tube contained in a Department of Health test kit. Mackler repeated that process approximately twenty-three minutes later at 5:33 a.m. Those samples were given to Trooper Bruning, who submitted them for analysis to the Department's Chemical Testing Program. The tests indicated a .17% alcohol concentration.

[¶10] On January 12, 2012, the Carbon County and Prosecuting Attorney charged Stowe with two felonies: driving while under the influence of intoxicating liquor, and child

2

endangerment.[2]  Approximately nine months later, her attorney filed a motion to suppress the urine test results for the reasons raised in this appeal.  Following a hearing in early December of 2012, the district court denied her motion in all respects but one.[3]

[¶11]  The court scheduled a change of plea hearing for January 11, 2013 at the request of the parties.  Just prior to that hearing, they filed a plea agreement letter signed by Stowe, her attorney, and the prosecutor.  As is evident from that document and the ensuing discussion of the agreement at the hearing, the State offered to dismiss the child endangerment charge and cap its sentencing recommendation on the remaining charge.  In exchange, Stowe would enter a conditional nolo contendere plea to the felony drunk driving charge, reserving the right to challenge the denial of her suppression motion on appeal.[4]

[¶12]  The court accepted the plea agreement and Stowe's plea and sentenced her to imprisonment for a term of nineteen to twenty-four months.  Stowe timely perfected this appeal.

## STANDARD OF REVIEW

[¶13]  As we have previously stated:

> We review the district court's factual findings on a motion to suppress for clear error. We defer to those findings and view the evidence in the light most favorable to the prevailing party because the district court is in the best position to weigh the evidence, assess the credibility of witnesses, and make the necessary inferences, deductions, and conclusions.

---

[2] The former was a felony because it was Stowe's fourth driving under the influence offense in ten years. Wyo. Stat. Ann. § 31-5-233(e) (LexisNexis 2013 & Supp. 2014).  The latter was a felony because she previously had been convicted of child endangerment.  Wyo. Stat. Ann. § 6-4-403(c) (LexisNexis 2013).

[3] Although the court denied Stowe's motion with respect to the suppression of the chemical analysis of her urine, it did suppress the result of tests performed on a sample of her blood which the State conceded was unlawfully collected.

[4] The intent to enter a conditional plea was clearly set out in writing in the plea agreement letter, and to that extent it conformed to the requirements of W.R.Cr.P. 11(a)(2).  However, it did not strictly comply with that rule because that writing did not specify the pretrial motion, the adverse determination of which Stowe wanted to challenge.  We will overlook that omission because the suppression motion was the only significant motion Stowe filed, and because the transcript of the change of plea hearing leaves no doubt that the parties and the district court knew that she wished to challenge the denial of the suppression motion. *Smith v. State*, 871 P.2d 186, 189 (Wyo. 1994).  Nevertheless, we remind the criminal bar that strict compliance with Rule 11(a)(2) is the best practice. *Matthews v. State*, 2014 WY 54, ¶ 15 n.1, 322 P.3d 1279, 1281 n.1 (Wyo. 2014).

*Hunnicutt-Carter v. State*, 2013 WY 103, ¶ 20, 308 P.3d 847, 852 (Wyo. 2013). However, we review *de novo* the district court's ultimate determination as to whether a particular search or seizure was lawful. *Id.*

## DISCUSSION

**Probable Cause**

[¶14] Stowe first argues that Sergeant Warne did not have probable cause to arrest her or arrange to collect her urine as required by Wyo. Stat. Ann. § 31-6-102(a)(i), which provides as follows:

> (a) If arrested for an offense as defined by W.S. 31-5-233[5]:
>
> > (i) Any person who drives or is in actual physical control of a motor vehicle upon a public street or highway in this state is deemed to have given consent, subject to the provisions of this act, to a chemical test or tests of his blood, breath or urine for the purpose of determining the alcohol concentration or controlled substance content of his blood. The test or tests shall be:
> >
> > > (A) Incidental to a lawful arrest;
> > >
> > > (B) Given as promptly as possible after the arrest;
> > >
> > > (C) Administered at the direction of a peace officer who has probable cause to believe the person was driving or in actual physical control of a motor vehicle upon a public street or highway in this state in violation of W.S. 31-5-233(b) or any other law prohibiting driving under the influence as defined by W.S. 31-5-233(a)(v). The peace officer who requires a test for alcohol concentration pursuant to this section may direct that the test shall be of blood, breath or urine. However, if the officer directs that the test be of the person's blood or urine, the person may choose whether the test shall be of blood or urine. The person shall not have the option if the peace officer has probable cause to believe there is impairment by a controlled substance which is not subject

---

[5] This statute prohibits driving while under the influence of alcohol or a controlled substance.

to testing by a breath test in which case a blood or urine test may be required, as directed by the peace officer.

Wyo. Stat. Ann. § 31-6-102(a)(i) (LexisNexis 2013).

[¶15] Two subparagraphs of the statute touch upon probable cause. Subparagraph (a)(i)(A) requires that a test for alcohol be incidental to a "lawful arrest" for driving under the influence. Stowe's arrest without a warrant was "lawful" under the Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution only if supported by probable cause. *Ostrowski v. State*, 665 P.2d 471, 476 (Wyo. 1983). Subparagraph (a)(i)(C) directly addresses the same point by requiring that tests for alcohol be administered "at the direction of a peace officer who has probable cause to believe the person was driving" under the influence.[6]

[¶16] Stowe does not go so far as to argue that there was no probable cause to arrest her for driving while intoxicated or to direct that her urine be tested for the presence of alcohol. Her argument is much narrower. She asserts that her arrest and the test were unlawful because Sergeant Warne was not aware of the evidence which established probable cause when he arrested her.

[¶17] Although she does not say it in so many words, Stowe seems to argue that Sergeant Warne, as the officer who directed that the urine test be administered, had to have personal knowledge amounting to probable cause to believe that she was driving under the influence. She also appears to argue that the evidence and probable cause developed by Trooper Bruning cannot be imputed to Sergeant Warne. Those arguments, however, rely on a reading of the statute which would require us to ignore the realities of accident investigation in the vast distances of this state, as well as longstanding Wyoming and federal constitutional law governing warrantless arrests.

[¶18] In interpreting statutes, we seek to determine the legislature's intent:

> All statutes must be construed *in pari materia* and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is de novo. We endeavor to interpret statutes in accordance with the legislature's intent. We begin by making an inquiry respecting the ordinary and obvious meaning of the words

---

[6] "Probable cause for a warrantless arrest exists when, under the totality of the circumstances, a prudent, reasonable, and cautious peace officer would be led to believe that a crime has been or is being committed and the individual arrested is the perpetrator." *Vasco v. State, Dep't of Transp.*, 2011 WY 100, ¶ 15, 253 P.3d 515, 519 (Wyo. 2011).

employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute *in pari materia*. When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. Moreover, we must not give a statute a meaning that will nullify its operation if it is susceptible of another interpretation.

Moreover, we will not enlarge, stretch, expand, or extend a statute to matters that do not fall within its express provisions.

Only if we determine the language of a statute is ambiguous will we proceed to the next step, which involves applying general principles of statutory construction to the language of the statute in order to construe any ambiguous language to accurately reflect the intent of the legislature. If this Court determines that the language of the statute is not ambiguous, there is no room for further construction. We will apply the language of the statute using its ordinary and obvious meaning.

*Redco Const. v. Profile Properties, LLC*, 2012 WY 24, ¶ 26, 271 P.3d 408, 415-16 (Wyo. 2012) (quoting *Cheyenne Newspapers, Inc. v. Building Code Bd. of Appeals of City of Cheyenne*, 2010 WY 2, ¶ 9, 222 P.3d 158, 162 (Wyo. 2010) (which in turn cites *BP Am. Prod. Co. v. Dep't of Revenue*, 2005 WY 60, ¶ 15, 112 P.3d 596, 604 (Wyo. 2005)).

[¶19] Although Sergeant Warne arranged for Nurse Mackler to collect samples of Stowe's urine, it is uncontested that he did so at the direction of Trooper Bruning as communicated through Corporal Cohee. To suggest that Trooper Bruning cannot be deemed to be the peace officer with probable cause to direct the administration of urine collection and testing would oblige us to find that the legislature intended to require that officers in the trooper's position make an untenable choice. That is, if Bruning could not "direct" the testing without being present at the hospital, he would have had to postpone finding, securing, and investigating the accident scene and proceed to the hospital. Alternatively, he could have driven nearly to Medicine Bow, processed the scene, and then returned to Casper—all the while delaying the collection of Stowe's testable bodily fluids.[7]

---

[7] Appellant may also suggest that the officer possessing probable cause must relay the information he possesses to the arresting officer. This would be the law enforcement equivalent of the game of

[¶20] The record tells us that when Stowe's urine was collected, its alcohol concentration was decreasing, that hospital personnel had given her narcotics and other medications, and that doctors were awaiting the results of a CT scan to determine what further treatment might be necessary. That treatment might or might not have prevented collection of the sample. Nothing in the plain language of the statute indicates that the legislature intended to require law enforcement officers to make the choice Appellant's argument necessarily implies.

[¶21] We presume that the legislature has acted in a thoughtful and rational manner with full knowledge of existing law when it enacts a statute. *DiFelici v. City of Lander*, 2013 WY 141, ¶ 31, 312 P.3d 816, 824 (Wyo. 2013) (citing *Redco Const.*, ¶ 37, 271 P.3d at 418). Our constitutional analysis, which we presume was known to the legislature, supports our construction of the statute. In *Ostrowski v. State*, this Court evaluated a warrantless arrest made by a patrol officer solely on the basis that investigators in his agency had disseminated an agency-wide "pick up and hold order" relating to the arrestee. Ostrowski argued that the arrest was illegal because the patrolman was not aware of the facts that gave the investigators probable cause to call for his arrest. We characterized that position as unrealistic and contrary to law, and we held that the arrest was constitutionally valid because collectively the police investigators had developed probable cause when they requested that Ostrowski be picked up and held. We therefore concluded that the arresting officer was entitled to act on the strength of that order. 665 P.2d at 476-77.

[¶22] In affirming the denial of a similar suppression motion, the Tenth Circuit Court of Appeals recently applied the same rule, which it referred to as the "vertical collective knowledge doctrine." It explained as follows:

> Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action. [*United States v. Chavez*, 534 F.3d 1338, 1345-46 (10th Cir. 2008)]. In *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Supreme Court held that when officers initiated a *Terry* stop based on a flyer or bulletin, reliance on the flyer or bulletin was proper so long as the officers that issued the flyer had a reasonable suspicion about the person it targeted. *Id.* at 231-32, 105 S.Ct. 675. Thus, an officer with reasonable suspicion may

---

"Telephone," and would provide a defendant with no more protection than is available under the existing rules discussed below.

instruct another officer to make a *Terry* stop without communicating the basis for the stop, so long as the communicating officer has reasonable suspicion to make the stop himself. *See Chavez*, 534 F.3d at 1347-48 (upholding a stop when federal agent who requested officer to stop the suspect had "all the requisite probable cause components" but did not communicate them to the officer).

*United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012) (footnote and emphasis omitted).

[¶23] For the same reasons, Stowe's warrantless arrest by Sergeant Warne was constitutional because it was based on information gathered by Trooper Bruning, and Warne's conduct in arranging to collect a urine sample for testing at the behest of Bruning therefore complied with Wyo. Stat. Ann. § 31-6-102(a).

**Use of the Catheter**

[¶24] Stowe's second argument, that a scientifically valid urine sample was not drawn from her catheter, is based on a statutory provision which provides that "[c]hemical analysis of the person's . . . urine to be considered valid under this section, shall be performed according to methods approved by the department of health[.]" Wyo. Stat. Ann. § 31-6-105(a) (LexisNexis 2013). The department's rules establish only a few requirements for collecting urine samples. Two samples must be taken approximately thirty minutes apart, and each must be placed in a sample tube containing a preservative, must be sealed to prevent tampering, and must be sent to the chemical testing laboratory. Wyo. Dep't of Health, Rules and Regulations for Chemical Analysis for Alcohol Testing, ch. 3, § 4 (2013). In addition, subsection (c) of that rule provides that "[t]he sample may be collected in a clean container and transferred to the sample tube."

[¶25] To resolve this issue, we must interpret the foregoing regulation. We apply the rules of statutory construction set out above to administrative rules and regulations. *Wilson Advisory Comm. v. Bd. of Cnty. Comm'rs*, 2012 WY 163, ¶ 31, 292 P.3d 855, 863 (Wyo. 2012).

[¶26] Stowe argues that the catheter tubing is a container, that Nurse Mackler did not clean the tubing after taking the first sample, and that therefore the second sample was not collected in conformance with the rule.[8] James Moore of the Wyoming Chemical

---

[8] We note that Appellant's counsel raised this issue only tangentially. When questioning Nurse Mackler, he established that she did not clean or irrigate the catheter tubing, which he characterized as a container, much to her confusion. He did not argue the precise issue he now raises to the district court, which did not therefore directly address it in its thorough decision letter, although it did make general findings which are helpful to our review. We ordinarily do not consider issues not clearly brought to the attention

Testing Program testified at the hearing on the motion to suppress. He explained that he was familiar with and partially responsible for the development and revision of the rules governing chemical testing. He indicated that Chapter 3, § 4 of the Department rules does not prohibit taking a urine sample from a catheter, and that the rules intentionally do not differentiate between "catheterized samples or free-flow samples or midstream samples or any other type of sample." This was intended to permit flexibility in obtaining urine samples.

[¶27] Moore explained that the only concern with collecting a sample from a catheter would be whether the catheter was properly inserted using a medically accepted and aseptic technique. He testified that a sample taken from a catheter could be preferable to a sample that has gone through the bladder and urinary tract because the catheter sample has less chance of cross-contamination. He also indicated the Department never intended for a catheter to be viewed as a "container" for collection purposes, but that the catheter tube is viewed as the direct source of the urine because the tube is connected directly to the bladder.

[¶28] Mr. Moore's testimony was intended to explain the Department of Health's interpretation of rules it has promulgated. We defer to an agency's interpretation of its own rules unless that interpretation is clearly erroneous or inconsistent with the plain language of the rules. *Wilson Advisory Comm.*, ¶ 22, 292 P.3d at 862 (citing *Powder River Basin Res. Council v. Wyo. Dep't of Envtl. Quality*, 2010 WY 25, ¶ 6, 226 P.3d 809, 813 (Wyo. 2010)).

[¶29] Mr. Moore's testimony as to the Department's interpretation and application of the rule is supported by the plain meaning of the words "tube" and "container." A "tube" is a hollow cylinder used to convey fluids. *Merriam Webster's Collegiate Dictionary* 1266 (10th ed. 2000). Conversely, a "container" is defined as a "receptacle for holding . . . goods." *Id* at 249. When a catheter is inserted into the bladder, it bypasses the urinary tract and the catheter tube passes the urine into a container. The "containers" used to collect Stowe's urine samples were the syringes.

[¶30] The district court found that Nurse Mackler "drew the urine into a syringe, then handed the syringe to Sergeant Warne who would then transfer the urine into a sample tube" and that she then cleaned the catheter port with iodine prior to each sample draw. The "containers" were the syringes. The district court determined that "[t]here is nothing to suggest that Nurse Mackler failed to use clean syringes to obtain each urine sample. Further, it is illogical that Nurse Mackler would use the same syringe for a second urine draw more than twenty minutes later. . . . [I]t simply does not make sense to now assume

---

of the district court when a defendant enters a conditional plea. *Kunselman v. State*, 2008 WY 85, ¶ 11, 188 P.3d 567, 569-70 (Wyo. 2008). We reach the merits here only because the limited questioning is in the record, because there are related findings, and because the contention may fall within a subset of the arguments actually made.

that Nurse Mackler used the same (now dirty) syringe for the second draw after disinfecting the port."

[¶31] In other words, the district court indirectly found that the collection method complied with the Department of Health regulations. We agree. We also note that Appellant offered no evidence that this collection method could in some way have led to a false increase in her urine alcohol concentration when the samples were tested.

## CONCLUSION

[¶32] As a matter of both constitutional and Wyoming statutory law, Sergeant Warne properly arrested Stowe and arranged for a urine sample to be taken at the direction of Trooper Bruning. The urine sample was collected in a manner authorized by the applicable statute and Department of Health regulations. The district court's denial of the motion to suppress and the judgment and sentence are therefore affirmed.