KAUTZ, Justice.
*894 [¶1] Joshua Lee Pier was convicted of three controlled substance charges. On appeal, he claims the district court erred by denying his motion to suppress the evidence discovered during a search of his vehicle. We affirm.
ISSUE
[¶2] Mr. Pier states a single issue on appeal:
Did the trial court commit constitutional error and abuse its discretion by failing to suppress evidence that was obtained by illegal search and seizure contrary to the Fourth Amendment of the United States Constitution?
FACTS
[¶3] In April 2017, Wyoming Division of Criminal Investigation Special Agent Luke Rippy learned that Mr. Pier was supplying Derek Archibeque with methamphetamine. Mr. Archibeque said Mr. Pier obtained drugs from a man in Colorado named Terry Kelly and he had accompanied Mr. Pier on one of his trips to pick up drugs from Mr. Kelly. Mr. Archibeque described Mr. Kelly as a white male approximately six feet tall with a bald head and light brown goatee. Mr. Archibeque told Special Agent Rippy that Mr. Pier drove a green Chevrolet pickup and hid the drugs in gas station cups disguised as trash. He also said Mr. Pier used methamphetamine with his girlfriend, Naomi Atkinson.
[¶4] Special Agent Rippy was able to confirm much of the information provided by Mr. Archibeque. He was familiar with Ms. Atkinson from prior cases and "knew her to be a user of methamphetamine." Special Agent Rippy checked with Colorado law enforcement and learned Mr. Kelly was under investigation for drug trafficking. He obtained a driver's license photo of Mr. Kelly which matched the physical description given by Mr. Archibeque, and the Northern Colorado Drug Task Force identified the person in the photo as Mr. Kelly. Special Agent Rippy was also able to confirm Mr. Pier drove a vehicle consistent with the one described by Mr. Archibeque.
[¶5] Special Agent Rippy applied for and received a search warrant to place a global positioning system (GPS) tracking device on Mr. Pier's pickup. At 12:39 a.m. on May 5, 2017, the tracker alerted Special Agent Rippy that Mr. Pier's pickup had left Laramie headed south on U.S. Highway 287. At 12:57 a.m., the pickup crossed the state line into Colorado.
[¶6] Special Agent Rippy contacted Wyoming Highway Patrol Trooper Aaron Kirlin at approximately 4:30 a.m. on May 5, 2017. Special Agent Rippy had previously informed Trooper Kirlin about his investigation into Mr. Pier's drug-related activities and requested that the trooper and his drug-detection canine, Frosty, assist in the investigation. At 5:10 a.m. on May 5, 2017, the GPS tracking device alerted Special Agent Rippy that Mr. Pier's vehicle had re-entered the State of Wyoming and was headed north towards Laramie on U.S. Highway 287. Special Agent Rippy advised Trooper Kirlin of Mr. Pier's approach. Special Agent Rippy told Trooper Kirlin the suspect was Mr. Pier, described the vehicle he was driving, and said he suspected there would be controlled substances in the vehicle, which may be hidden in disposable cups disguised to look like garbage.
[¶7] Mr. Pier's pickup turned off Highway 287 onto Fort Sanders Road, and Trooper Kirlin headed in that direction. When Trooper Kirlin located Mr. Pier's vehicle, he used his radar to determine Mr. Pier was driving 43 miles per hour in a 40 mile per hour zone. Trooper Kirlin decided to stop Mr. Pier for the speeding violation. The trooper caught up *895 with Mr. Pier as he turned onto a side street and into a trailer park. Mr. Pier stopped his vehicle next to one of the trailers, got out and began walking away. Trooper Kirlin activated his lights and exited the patrol vehicle. He directed Mr. Pier to "come over" to him and informed Mr. Pier that he was going to issue him a warning for speeding.
[¶8] Trooper Kirlin patted Mr. Pier down for weapons and asked him to sit in the front passenger seat of the patrol vehicle. Mr. Pier said he did not have a driver's license, and Trooper Kirlin asked for his name. Mr. Pier replied that his name was "Jonah," which is his brother's name. He also gave Trooper Kirlin his brother's date of birth. Based upon prior interactions with Mr. Pier, Trooper Kirlin knew the answer was untrue. Trooper Kirlin asked Mr. Pier why he was lying, and he said he was worried that his driver's license was suspended. Trooper Kirlin confirmed Mr. Pier's identity and that he had a valid driver's license.
[¶9] Trooper Kirlin asked Mr. Pier about his travels - where he had come from and where he was going. Mr. Pier responded that he had come from his girlfriend's house "[j]ust down the street," where he had "been all night." He said he had pulled onto the side street because he was "doing ... some construction work in the general area." Trooper Kirlin knew Mr. Pier's answer about where he was traveling from was not true because the GPS tracking device on Mr. Pier's pickup showed he had just come from Colorado. Trooper Kirlin stated that his investigation of the speeding ended when Mr. Pier "starting lying" to him.
[¶10] Trooper Kirlin asked Mr. Pier if there was anything illegal in the pickup, and Mr. Pier responded in the negative. Trooper Kirlin asked for permission to search the pickup, but Mr. Pier refused to consent to a search. Trooper Kirlin then deployed Frosty to sniff the exterior of the pickup. Frosty alerted at the driver's side window.
[¶11] Trooper Kirlin searched Mr. Pier's vehicle, which was filled with "stuff." Mr. Pier said he was living in his pickup. Trooper Kirlin discovered:
a small amount of prescription pills found in a cigarette box, two scales with suspected methamphetamine residue found in a backpack behind the driver's seat, a gas station coffee cup that contained two large bags of methamphetamine, a small bag of methamphetamine, a bag of black tar heroin, a bag of powdered heroin, a bag of marijuana, several jewelers bags, several syringes, and another small scale.
[¶12] Trooper Kirlin arrested Mr. Pier, and the State charged Mr. Pier with four counts: 1) possession of methamphetamine in an amount greater than three grams; 2) possession with intent to deliver methamphetamine; 3) possession of heroin in an amount greater than three grams; and 4) possession with intent to deliver heroin. Mr. Pier pleaded not guilty and filed a motion to suppress the evidence obtained in the search of his pickup.[1] The district court held a hearing on Mr. Pier's motion to suppress on November 21, 2017. In an order dated December 7, 2017, the district court denied the motion.
[¶13] Mr. Pier was tried before a jury in December 2017. The jury found him guilty of the first three counts but acquitted him of the fourth count. The district court entered judgment on the jury's verdict. It concluded the first two counts (possession of methamphetamine and possession with intent to deliver methamphetamine) merged for sentencing and sentenced Mr. Pier to serve ten to fifteen years in prison on Count II. It sentenced Mr. Pier to serve three to five years in prison on Count III, to run concurrently to the sentence on Count II. Mr. Pier filed a timely notice of appeal.
STANDARD OF REVIEW
[¶14] We apply the following standard in reviewing a denial of a motion to suppress evidence:
[W]e defer to the court's findings of fact unless they are clearly erroneous. Jennings v. State , 2016 WY 69, ¶ 8, 375 P.3d 788, 790 (Wyo. 2016). We consider the evidence in the light most favorable to the *896 district court's decision because the court had the opportunity to assess the credibility of the witnesses and hear the evidence in the first instance. Owens v. State , 2012 WY 14, ¶ 8, 269 P.3d 1093, 1095 (Wyo. 2012). The underlying legal issue-whether a search or seizure was unreasonable and in violation of the defendant's constitutional rights-is reviewed de novo . Jennings , ¶ 8, 375 P.3d at 790.
Kennison v. State, 2018 WY 46, ¶ 11, 417 P.3d 146, 149 (Wyo. 2018). Mr. Pier does not argue that the district court's factual findings were clearly erroneous. Consequently, we will focus our discussion on the legal issues. See Feeney v. State, 2009 WY 67, ¶ 15, 208 P.3d 50, 55 (Wyo. 2009).
DISCUSSION
[¶15] Mr. Pier claims Trooper Kirlin violated his rights under the Fourth Amendment to the United States Constitution[2] when he detained him for the dog sniff and searched his pickup without a warrant.
[¶16] The Fourth Amendment states:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
"A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." Kennison, ¶ 13, 417 P.3d at 149 (quoting Allgier v. State , 2015 WY 137, ¶ 14, 358 P.3d 1271, 1276 (Wyo. 2015), which quoted Heien v. North Carolina , --- U.S. ----, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014) ). A traffic stop is analogous to an investigative detention and is justified if the officer has reasonable suspicion a crime has been or is being committed. Venegas v. State, 2012 WY 136, ¶¶ 8-9, 287 P.3d 746, 748-49 (Wyo. 2012). "Reasonable suspicion entails some minimal level of objective justification for making a stop-that is, something more than an inchoate and unparticularized suspicion or hunch, but less than the level of suspicion required for probable cause." Jennings , ¶ 9, 375 P.3d at 791. Reasonable suspicion "requires a fact-centered inquiry based upon the 'totality of the circumstances.' " Venegas, ¶ 9, 287 P.3d at 749 (quoting Fender v. State, 2003 WY 96, ¶ 13, 74 P.3d 1220, 1225 (Wyo. 2003) ).
[¶17] We use the two-part inquiry from Terry v. Ohio , 392 U.S. 1, 19-20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) to determine whether a traffic stop and resulting seizure was reasonable under the Fourth Amendment: "(1) whether the initial stop was justified; and (2) whether the officer's actions during the detention were reasonably related in scope to the circumstances that justified the interference in the first instance." Kennison, ¶ 13, 417 P.3d at 150 (citing Hembree v. State , 2006 WY 127, ¶ 12, 143 P.3d 905, 908 (Wyo. 2006) ).
1. Initial Stop
[¶18] Although Mr. Pier asserts Trooper Kirlin initially stopped him for speeding as a "pretext" to conduct a drug investigation, he concedes that is permitted under the federal constitution. "In Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996), the United States Supreme Court determined that a pretextual traffic stop did not violate the search and seizure protections afforded by the Fourth Amendment to the United States Constitution." Fertig v. State, 2006 WY 148, ¶ 12, 146 P.3d 492, 496 (Wyo. 2006). Provided the officer has reasonable suspicion to initiate a stop, "an officer's subjective intent to search for drugs does not invalidate an otherwise lawful traffic stop." Fertig, ¶ 14, 146 P.3d at 496 ;
*897 Damato v. State, 2003 WY 13, ¶¶ 9-10, 64 P.3d 700, 705 (Wyo. 2003). Thus, Trooper Kirlin's initial stop of Mr. Pier was justified because he was traveling 43 miles per hour in a 40 mile per hour zone, even though the trooper's subjective intent was to search for drugs.
2. Detention
[¶19] The second part of the Terry inquiry is the reasonableness of the detention. Kennison, ¶ 13, 417 P.3d at 150.
If a traffic stop is justified, the resulting detention must last "no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." Hembree , ¶ 13, 143 P.3d at 909. (quoting O'Boyle v. State , 2005 WY 83, ¶ 47, 117 P.3d 401, 414 (Wyo. 2005) ). "In the course of making a routine traffic stop, a law enforcement officer may: request a driver's license and vehicle registration; run a computer check; and issue a citation." Damato v. State , 2003 WY 13, ¶ 13, 64 P.3d 700, 706 (Wyo. 2003). A driver must be allowed to continue his journey without delay once the officer determines the driver has a valid license and is entitled to drive the vehicle. However, the detention can be extended beyond the original purpose of the traffic stop with the individual's consent or if the officer has objectively reasonable and articulable suspicion further criminal activity has occurred or is occurring . See id .
Kennison, ¶ 15, 417 P.3d at 150 (some internal citations omitted) (emphasis added).
[¶20] Mr. Pier does not challenge Trooper Kirlin's actions during his initial detention for speeding. However, he asserts the district court erred by concluding Trooper Kirlin was justified in expanding the scope of the detention for the canine sniff. The district court determined:
Here, Trooper Kirlin[ ] was aware that [Mr. Pier] was under investigation for dealing controlled substance[s]. This alone does not meet the level of reasonable suspicion. However, [Mr. Pier] provided Trooper Kirlin with a name known to be false by the Trooper. Further, when questioned about his prior travels, [Mr. Pier] again lied to Trooper Kirlin. Trooper Kirlin knew based on prior discussions with Special Agent Rippy where the defendant had been prior to the traffic stop. Lastly, Trooper Kirlin had ... prior interactions with [Mr. Pier] where [he] was in possession of marijuana and felony amounts of steroids.
Based on Trooper Kirlin's prior interaction with [Mr. Pier], the knowledge gained from Special Agent Rippy and the numerous lies by [Mr. Pier], there were specific and articulable facts, along with rational inferences which gave rise to reasonable suspicion. Thus, Trooper Kirlin did not violate [Mr. Pier's] Fourth Amendment ... protections in expanding the stop ... to have his canine sniff the vehicle.
The district court's decision identifies three bases for its conclusion that Trooper Kirlin had the requisite reasonable suspicion to expand the scope of the stop to investigate for drug-related crimes: 1) information from Special Agent Rippy about the investigation of Mr. Pier's drug-related activities; 2) Mr. Pier's lies about his name and travels; and 3) Trooper Kirlin's prior interaction with Mr. Pier during which illegal drugs were discovered in Mr. Pier's possession.
[¶21] Special Agent Rippy contacted Trooper Kirlin seeking his assistance to intercept Mr. Pier as he returned to Laramie from Colorado. He told Trooper Kirlin that Mr. Pier may be transporting drugs back from Colorado and that he was tracking Mr. Pier's vehicle with GPS device. Under the collective knowledge doctrine, one officer can rely upon the information other officers have compiled regarding a suspect's criminal activity. "[T]he officer who makes the stop need not have reasonable suspicion that criminal activity is afoot. Instead, the knowledge and reasonable suspicions of one officer can be imputed to another." United States v. Whitley, 680 F.3d 1227, 1234 (10th Cir. 2012). See also , Stowe v. State, 2014 WY 97, ¶ 22, 331 P.3d 127, 133 (Wyo. 2014). The vertical collective knowledge doctrine allows an officer with reasonable suspicion to direct another officer to make a stop, even without sharing all the information justifying the stop. Id.
*898 [¶22] Special Agent Rippy had developed a great deal of information about Mr. Pier's drug activities and asked Trooper Kirlin to stop Mr. Pier as he was returning from his late-night trip to Colorado. Special Agent Rippy's knowledge would have been imputed to Trooper Kirlin even if he had not discussed the investigation with him. Here, though, the connection is even stronger because Special Agent Rippy did not simply direct Trooper Kirlin to make the stop, he told Trooper Kirlin about DCI's investigation of Mr. Pier.
[¶23] Much of Special Agent Rippy's information about Mr. Pier's drug-related activities was gleaned from Mr. Archibeque. "Reasonable suspicion can come from the officer's personal observations or from information provided by an informant." Venegas, ¶ 9, 287 P.3d at 749 (citing Orchard v. State, 2011 WY 145, ¶ 12, 262 P.3d 197, 201 (Wyo. 2011) ).
Reliance upon an informant's tip is reasonable if the tip contains "sufficient 'indicia of reliability' " such as predicting another person's future behavior, relating to specific information showing the informant's knowledge of that person's affairs, and so long as the police can corroborate some portion of the tip. [ Orchard, ¶ 12, 262 P.3d at 201 ]; Buckles v. State, 998 P.2d 927, 930 (Wyo. 2000). A tip from an identified informant is generally regarded as more reliable than one from an anonymous informant because identification exposes the person to possible prosecution if the report proves false. McChesney v. State, 988 P.2d 1071, 1076 (Wyo. 1999).
Venegas, ¶ 9, 287 P.3d at 749.
[¶24] Mr. Archibeque explained to Special Agent Rippy how Mr. Pier obtained drugs from his source in Colorado, Terry Kelly, and then distributed them in Laramie. Mr. Archibeque had personal knowledge of these matters because he had obtained methamphetamine from Mr. Pier and traveled to Colorado with him to pick up drugs from Mr. Kelly. He described Mr. Kelly and the vehicle Mr. Pier drove to Colorado. Mr. Archibeque also said that Mr. Pier used drugs with Ms. Atkinson.
[¶25] Special Agent Rippy was able to confirm much of the information provided by Mr. Archibeque. Special Agent Rippy was familiar with Ms. Atkinson and knew she was a drug user. He learned from Colorado law enforcement that Mr. Kelly was under investigation for drug trafficking. The information he obtained about Mr. Kelly was consistent with the physical description given by Mr. Archibeque. Special Agent Rippy was also able to confirm Mr. Pier drove a vehicle consistent with the one described by Mr. Archibeque. Mr. Archibeque accurately predicted that Mr. Pier would travel to Colorado to obtain drugs. The GPS tracking device on Mr. Pier's pickup showed he traveled to Colorado and back to Laramie in the middle of the night on May 5, 2017.
[¶26] Mr. Pier argues Mr. Archibeque was not a reliable source of information because he asserted his Fifth Amendment right to remain silent when he was called to testify at the suppression hearing. Mr. Pier cites no authority for his position that an informant is not reliable because he asserts his Fifth Amendment rights at a later proceeding. We do not address arguments not supported by cogent argument or citation to pertinent authority. Blevins v. State, 2017 WY 43, ¶ 22, 393 P.3d 1249, 1254 (Wyo. 2017). Given the information provided by Mr. Archibeque was, in large part, independently corroborated by law enforcement, the district court properly considered it in determining Trooper Kirlin had reasonable suspicion that Mr. Pier had committed or was committing a drug-related crime.
[¶27] Mr. Pier also lied to Trooper Kirlin about his name and his travels. In Negrette v. State, 2007 WY 88, ¶ 23, 158 P.3d 679, 685 (Wyo. 2007), we held that the defendant's false answer to the officer's question about who owned the vehicle, contributed to the officer's rising suspicion that "criminal activity was afoot." The false answer, combined with other suspicious circumstances, justified the officer's expansion of the scope of the stop. Id. Similarly, Mr. Pier's lie about his name contributed to Trooper Kirlin's rising suspicion.
[¶28] We have also recognized that inconsistencies in a traveler's itinerary are properly *899 considered in the reasonable suspicion analysis. In Sutton v. State, 2009 WY 148, ¶ 18, 220 P.3d 784, 790 (Wyo. 2009), we held that the contradiction between the rental agreement which said the car should have been returned the previous day and Mr. Sutton's statement that he had extended the term of the rental reasonably contributed to the officer's suspicion. In Feeney, ¶¶ 20-21, 208 P.3d at 56-57, the trooper's discovery that Mr. Feeney was lying about his travel plans was a proper consideration in determining whether the trooper had reasonable suspicion to extend the stop. See also , Garvin v. State, 2007 WY 190, ¶¶ 15-17, 172 P.3d 725, 729-30 (Wyo. 2007) (rental agreement showing the car should have been returned six days before the stop was appropriately considered in the reasonable suspicion analysis).
[¶29] In response to Trooper Kirlin's question about where he was coming from, Mr. Pier said he had spent the night at his girlfriend's place just down the street. Trooper Kirlin knew this to be untrue because Special Agent Rippy had used the GPS device to track Mr. Pier's pickup to Colorado and back. Trooper Kirlin appropriately considered the contradiction between Mr. Pier's response and the GPS information in his reasonable suspicion analysis.
[¶30] Finally, the district court concluded that Trooper Kirlin properly considered his prior interaction with Mr. Pier in concluding he had reasonable suspicion to extend the stop. Trooper Kirlin testified that he had contact with Mr. Pier during a traffic stop in September 2016. Another officer had stopped Mr. Pier and requested that Trooper Kirlin come to the scene to have Frosty sniff Mr. Pier's vehicle. After the dog alerted, law enforcement discovered marijuana and illegal steroids in Mr. Pier's pickup.[3] Although a suspect's criminal history cannot, by itself, establish reasonable suspicion, it is one factor that may justify further detention. United States v. Simpson, 609 F.3d 1140, 1147 (10th Cir. 2010). See also , Tucker v. State, 2009 WY 107, ¶¶ 23-25, 214 P.3d 236, 243-44 (Wyo. 2009) (law enforcement's knowledge of Mr. Tucker's prior controlled substances convictions was relevant in determining whether the officer had probable cause to search his vehicle). In totality, these circumstances gave Trooper Kirlin reasonable, articulable suspicion that Mr. Pier was engaged in drug crimes, justifying his further detention.
3. Canine Sniff
[¶31] Mr. Pier argues Trooper Kirlin needed probable cause to use the drug dog. A dog sniff of the exterior of a vehicle is not a search under the Fourth Amendment. Wallace v. State, 2009 WY 152, ¶ 15, 221 P.3d 967, 970-71 (Wyo. 2009). See also , Illinois v. Caballes, 543 U.S. 405, 409, 125 S.Ct. 834, 838, 160 L.Ed.2d 842 (2005) (sniff by a well-trained narcotics-detection dog of the exterior of the defendant's car during a lawful traffic stop did not intrude upon the defendant's legitimate privacy expectations under the Fourth Amendment). Thus, use of a drug dog does not have to be justified by probable cause or even by reasonable suspicion. Wallace, ¶¶ 15, 221 P.3d at 970-71. However, when the dog sniff cannot be accomplished within the time of the original detention, the officer must have reasonable suspicion of other illegal activity to extend the duration of the stop to allow for the dog sniff. Yoeuth v. State, 2009 WY 61, ¶ 28, 206 P.3d 1278, 1285 (Wyo. 2009). Although Frosty's sniff was not within the scope of the initial detention, as we stated above, Trooper Kirlin had reasonable suspicion to extend the duration of the stop.
4. Search of the Vehicle
[¶32] The automobile exception to the warrant requirement allows law enforcement to search an automobile without a warrant if there is probable cause to believe the vehicle contains contraband or evidence of a crime. Tucker, ¶ 22, 214 P.3d at 243. "Under the United States Constitution, when a trained and reliable drug dog alerts during an exterior sniff of a vehicle, there is probable cause to search that vehicle." Yoeuth, ¶ 34, 206 P.3d at 1286 (citing United States v. Klinginsmith, 25 F.3d 1507, 1510 (10th Cir. 1994) ). See also , Wallace, ¶ 18, 221 P.3d at 971. Trooper Kirlin testified that Frosty was *900 certified as a drug dog, and Mr. Pier does not claim on appeal that the dog was improperly trained or unreliable. So, once Frosty alerted, Trooper Kirlin had probable cause to search the vehicle for drugs.
a. Mr. Pier's Claim a Warrant was Required because the Pickup was his Home
[¶33] Mr. Pier claims that the automobile exception to the warrant requirement did not apply because he was living in his pickup. The district court did not address this aspect of Mr. Pier's argument. However, at the suppression hearing, Trooper Kirlin testified that Mr. Pier told him he was living in his vehicle and there was "quite a bit of stuff in the back of the pickup" which corroborated his claim. We will, therefore, accept for the sake of discussion that Mr. Pier was living in his vehicle.
[¶34] Mr. Pier cites Recchia v. City of Los Angeles Dep't of Animal Servs., 889 F.3d 553 (9th Cir. 2018), as support for his argument that the warrantless search of the vehicle he was living in violated the Fourth Amendment. Mr. Recchia was a homeless person, living on the streets of Los Angeles, California, and he kept twenty birds in boxes and cages. Animal control officers seized the birds without a warrant, and all but two were euthanized because they had various maladies. Id. at 556-57.
[¶35] Recchia brought a civil claim under 42 USC § 1983 against the officers and the Los Angeles Department of Animal Services for violating his Fourth Amendment rights. Id. at 557. The Ninth Circuit Court of Appeals stated that "[h]omeless people living on the street enjoy the protection of the Fourth Amendment;" therefore, "the seizure of a homeless person's property implicates important Fourth Amendment concerns." Id. at 558. The government argued that exigent circumstances justified the officers' warrantless seizure of the birds because some of the birds were unhealthy or sick. Id. at 558-59. The court agreed that seizure of the sick birds was appropriate under the exigent circumstances exception to the warrant requirement. However, as to the healthy-looking birds, the court held there was a genuine issue of material fact as to whether they should have been seized without a warrant. Id. at 560.
[¶36] The glaring difference between this case and Recchia is Mr. Pier was living in a fully-functional automobile, not on the street. The automobile exception to the warrant requirement has two bases - 1) an automobile is readily mobile; and 2) a person has a lesser expectation of privacy in his automobile than his home. California v. Carney, 471 U.S. 386, 390-91, 105 S.Ct. 2066, 2069, 85 L.Ed.2d 406 (1985). Regarding mobility, it is not practicable to secure a warrant to search an automobile because it may be moved quickly out of the jurisdiction. Id. (citing Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) ). There is also a lesser expectation of privacy in an automobile than a home because of "the pervasive regulation of vehicles capable of driving on public highways." Id. at 386, 105 S.Ct. 2066, 2069.
[¶37] The fact that an automobile may also be used for shelter as a "home" or "residence" does not necessarily mean the automobile exception does not apply. Id. at 393-94, 105 S.Ct. 2066, 2069. In Carney, the United States Supreme Court ruled the automobile exception applied to the defendant's motor home which was parked in a "lot" not regularly used for residential purposes. Id. at 388, 392-94, 105 S.Ct. 2066, 2069. The setting objectively indicated the vehicle was being used for transportation. Id. at 393-94, 105 S.Ct. 2066, 2069. The Court stated in a footnote that it did not need to "pass on the application of the vehicle exception to a motor home that is situated in a way or place that objectively indicates that it is being used as a residence." Id. at 394, n.3, 105 S.Ct. 2066. The factors it identified "that might be relevant in determining whether a warrant would be required in such a circumstance is its location, whether the vehicle is readily mobile or instead, for instance, elevated on blocks, whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient access to a public road." Id.
*901 [¶38] Applying these principles to the case at bar, it is apparent the automobile exception applied to Mr. Pier's pickup. Even though there was evidence Mr. Pier might also be using it as his home, Trooper Kirlin had just witnessed him driving the pickup, clearly showing it was mobile and being used for transportation. Thus, Mr. Pier was not entitled to a greater expectation of privacy accorded to homes.
b. Mr. Pier's Claim that a Warrant was Required because the Pickup was Stopped on Private Property Near a Trailer House
[¶39] Mr. Pier also claims a warrant was required to search his pickup because he was parked on private property next to a trailer house. Trooper Kirlin testified at the suppression hearing that Mr. Pier had already gotten out of his pickup when he activated the lights on his patrol vehicle. Mr. Pier also presented evidence that the trailer court where he was parked at the time of the search was private property. The owner of the trailer court testified that there are trailers on both sides of the road and the road is private property. He said that, based upon the description of the location where Mr. Pier's pickup was stopped, it was on the owner's private property. The owner also said that he and his wife had employed Mr. Pier several times in the past for maintenance and cleaning. He did not testify that Mr. Pier lived in the trailer court or was employed by him at the time of the stop. The district court did not address this aspect of Mr. Pier's argument. However, we will, again, accept for the sake of discussion that Mr. Pier was parked on private property next to a trailer house when Trooper Kirlin searched his pickup.
[¶40] Mr. Pier argues that an officer cannot use the automobile exception to justify a warrantless search of a parked car. The only authority he cites in support of his argument is an Oregon Supreme Court case - State v. Kurokawa-Lasciak , 351 Or. 179, 263 P.3d 336 (2011). The court ruled that to qualify for the automobile exception under the Oregon constitution, the car "must be mobile at the time that the police encounter it." Id. at 343. Thus, "any search of an automobile that was parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime must be authorized by a warrant." Id. at 341 (quoting State v. Kock, 302 Or. 29, 725 P.2d 1285 (1986) (emphasis omitted) ). The Oregon case is inapposite because it is based solely upon the Oregon constitution. The court specifically acknowledged that its decision may not comport with United States Supreme Court rulings applying the Fourth Amendment. Id. at 341, n.9. Furthermore, even under the Oregon rule, Trooper Kirlin's search would have been appropriate because Mr. Pier's vehicle was mobile when Trooper Kirlin first encountered it in connection with the speeding violation. Given the only authority cited by Mr. Pier was not based upon the Fourth Amendment and was clearly inapplicable to the circumstances presented in this case, we will not further examine Mr. Pier's argument that the automobile exception does not apply to parked cars. See Blevins , ¶ 22, 393 P.3d at 1254 (refusing to consider an issue as unsupported by cogent argument and citation to pertinent authority when the only authority cited by the appellant was clearly inapplicable).
[¶41] Next, Mr. Pier argues Trooper Kirlin could not search his vehicle because it was parked next to a home. He cites Florida v. Jardines, 569 U.S. 1, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) in support of his argument. In that case, the United States Supreme Court ruled that a warrantless drug dog sniff of the front porch of the defendant's home, which was within the protected curtilage, violated the Fourth Amendment. Id. at 4-5, 11-12, 133 S.Ct. 1409. Obviously, Jardines involves the search of a home, not an automobile, so its holding does not apply to Mr. Pier's circumstances.
[¶42] The United States Supreme Court recently discussed the intersection between the Fourth Amendment's protection of the sanctity of the home, including its curtilage, and the automobile exception to the warrant requirement. It concluded:
The automobile exception does not afford the necessary lawful right of access to search a vehicle parked within a home or *902 its curtilage because it does not justify an intrusion on a person's separate and substantial Fourth Amendment interest in his home and curtilage.
Collins v. Virginia, --- U.S. ----, 138 S.Ct. 1663, 1672, 201 L.Ed.2d 9 (2018).
[¶43] However, in order to claim the protections of the Fourth Amendment, a person must have "standing." The "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (discussing Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ). See also , Grissom v. State, 2005 WY 132, ¶ 15, 121 P.3d 127, 133 (Wyo. 2005) ; Minnesota v. Carter, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). "[A] defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.' " Carter, 525 U.S. at 88, 119 S.Ct. at 472 (quoting Rakas, 439 U.S. at 143-144, n.12, 99 S.Ct. 421 ). "The burden of proving that a reasonable expectation of privacy exists is on the proponent of a motion to suppress." Putnam v. State, 995 P.2d 632, 636 (Wyo. 2000).
[¶44] Mr. Pier is claiming the automobile exception did not apply because he was entitled to the protections afforded a home and its curtilage; therefore, he must establish he has some right to the house he parked near. The record contains no evidence that Mr. Pier had a legitimate expectation of privacy in the nearby trailer house. It clearly was not his home, as he claimed to be living in his pickup. The owner of the trailer court testified it was private property, but he did not say Mr. Pier had any right to be at the trailer court or the trailer house he parked by on that day. Consequently, Mr. Pier did not satisfy his burden of showing he had a reasonable expectation of privacy in the trailer court or the trailer.[4]
[¶45] Once Frosty alerted, Trooper Kirlin had probable cause to believe the pickup contained illegal drugs. Trooper Kirlin did not violate Mr. Pier's rights under the Fourth Amendment by searching his pickup pursuant to the automobile exception to the warrant requirement.
[¶46] Affirmed.

Mr. Pier also filed a motion to suppress the statements he made to law enforcement. The district court's ruling on that motion is not at issue in this appeal.

Although the district court cited both the Fourth Amendment and Article 1, § 4 of the Wyoming Constitution in its decision and Mr. Pier mentions the state constitution in his brief, Mr. Pier's stated issue on appeal and his appellate argument is based upon the Fourth Amendment. Given he has not provided a separate analysis of his rights under the Wyoming Constitution, we will limit our discussion to the United States Constitution. Kennison, ¶ 12, n.1, 417 P.3d at 149, n.1 ; Allgier, ¶ 12, 358 P.3d at 1275.

See Pier v. State, 2018 WY 79, 421 P.3d 565 (Wyo. 2018).

The owner also said that he had employed Mr. Pier to work at the trailer court in the past, and Mr. Pier mentions this fact in his brief. There is a body of law discussing the circumstances under which an employee can claim Fourth Amendment protection in his workplace. See, e.g. , O'Connor v. Ortega , 480 U.S. 709, 716-17, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987) ; Carter, 525 U.S. at 90-91, 119 S.Ct. 469. Mr. Pier does not, however, make any attempt to show that, as an employee, he had Fourth Amendment standing to challenge a search of that part of the trailer court.